**CONSOLIDATED FREIGHTWAYS, INC., Appellee,**

v.

**CEDAR RAPIDS CIVIL RIGHTS COMMISSION and Willard Wright, Appellants.**

**No. 84–125.**

Supreme Court of Iowa.

April 17, 1985.

David P. McManus, Asst. City Atty., Cedar Rapids, for appellant commission.

Mark H. Rettig of Hines, Pence, Day & Powers, Cedar Rapids, for appellant Wright.

John R. Carpenter, Iris E. Muchmore, and Roger W. Stone of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellee.

McCORMICK, Justice.

This civil rights case is based on a claim of employment discrimination in violation of an ordinance of the City of Cedar Rapids. Respondent Cedar Rapids Civil Rights Commission held that petitioner Consolidated Freightways, Inc. violated the ordinance when it discharged its employee, intervenor Willard Wright, upon his return from thirty days of treatment for alcoholism. The district court reversed the commission in a judicial review proceeding, and the commission and Wright appealed. We reverse the district court and remand the case to the commission for a determination of damages.

We must address questions concerning the nature of judicial review of decisions of municipal civil rights commissions, the standard for interpreting substantive provisions of civil rights ordinances, the meaning of the term "disability" in the Cedar Rapids ordinance, the sufficiency of evidence that Wright suffered from a disability, the sufficiency of evidence that Wright was discriminated against on the ground of a protected disability, and the necessity of remanding the case to the commission for a hearing on damages.

This employment discrimination claim is based on a theory of disparate treatment. Wright alleges he is an alcoholic, that his alcoholism did not prevent successful performance of his employment responsibilities, but that nevertheless he was discharged by his employer. Wright asserts that the discharge was discriminatory within the meaning of the Cedar Rapids civil

rights ordinance because he was discharged for a disability that is not related to his ability to perform his job in a reasonably competent and satisfactory manner.

The dispute was tried as a contested case before a hearing officer for the Cedar Rapids Civil Rights Commission. The hearing officer made extensive findings of fact and held that Wright had been subjected to disability discrimination under the ordinance. The commission adopted the hearing officer's findings and awarded damages to Wright, including back pay and attorney fees.

Upon the employer's petition for judicial review, the district court held that the commission finding of discrimination was unsupported by substantial evidence and therefore reversed the commission decision. In this appeal, Wright and the commission contend the district court erred in its holding on the discrimination issue. Although they contend the employer did have an opportunity to participate in the proceeding by which damages were determined, they do not resist remand of the case to the commission for a hearing on the damages issue.

Many of the critical facts in this case are disputed. Most of them concern Wright's employment history during the last several months before his termination and the credibility of witnesses who testified about the circumstances surrounding the termination. Other background facts are not in serious dispute.

Wright, who was thirty-nine years old at the time of the commission hearing, had been employed by Consolidated in Cedar Rapids as a sales representative since December 1978. His responsibilities included calling on shippers to obtain their truck freight business. He was required to entertain customers, including purchasing alcoholic beverages for them. He was not required to drink alcoholic beverages with the customers but did so. This included drinking at lunch as well as dinner. Company policy required him to conceal purchases of alcoholic beverages on his expense accounts by classifying them as other items. Wright testified that he had experienced a problem with alcohol since he took his first drink, approximately twenty years earlier. He sporadically attempted to control the problem and occasionally attended Alcoholics Anonymous meetings, but in the last year of his employment the problem became more severe. His employment was terminated on September 25, 1981.

Although Wright denied that his drinking ever adversely affected his job performance, he acknowledged that the problem reached critical proportions in his personal life. He was charged and convicted of assaulting his wife in December 1980. During that same month he was told by his supervisor, terminal manager Delbert Wyss, that he had had too much to drink at a company dinner and should cut down. During the late evening of July 2, 1981, he was arrested and charged with operating a motor vehicle while under the influence of alcohol. Wyss fired him because of that incident, but the decision was overruled on the same date by the Consolidated division manager in Peru, Illinois. The division manager subsequently came to Cedar Rapids, had dinner with Wright, and told him the incident should be forgotten.

In the meantime, Wright's relationship with his family continued to deteriorate. After an altercation with his stepson, a complaint of child abuse was lodged against him. Finally, in August 1981, he was charged again with assaulting his wife. Following discussions with his lawyer and doctor, he agreed to seek alcoholism treatment. He entered the Lakeside Alcohol Treatment Center in Marion, Iowa, on August 21, 1981, for a thirty-day period of residential treatment. The employer consented to the treatment, and the employer's insurance carrier paid for it. It was after his release from Lakeside on September 21, 1981, when Wright sought to return to work, that he learned his job was in jeopardy. He was placed on sick leave for four days and then notified by Wyss that his employment was terminated.

I. *Nature of review.* District court review was obtained in this case through a petition for judicial review under the Iowa Administrative Procedure Act. *See* Iowa Code § 17A.19 (1985). Because a municipal civil rights commission is not an "agency" under the definition in section 17A.2(1), the district court's jurisdiction depends on separate statutory authority for judicial review. This court has found the requisite statutory authority in the Iowa Civil Rights Act of 1965, Code chapter 601A. Under section 601A.19 a final decision by a "referral agency" is "subject to judicial review as provided in section 601A.17 in the same manner and to the same extent as a final decision of the commission." A municipal civil rights commission like the one in Cedar Rapids is deemed a "referral agency" for purposes of this provision. *See Dietz v. Dubuque Human Rights Commission,* 316 N.W.2d 859, 860–61 (Iowa 1982).

Therefore the district court acquired jurisdiction of the case upon the employer's petition for judicial review. Moreover, the scope of review is determined by the provisions of section 17A.19(8) as interpreted in our cases. *See, e.g., Jackson County Public Hospital v. PERB,* 280 N.W.2d 426, 429–30 (Iowa 1979). Thus the courts review action of the Cedar Rapids commission as if it were an agency expressly covered by the IAPA.

II. *The standard of interpretation.* Local civil rights ordinances must be consistent with the civil rights statute. § 601A.19; *Dietz,* 316 N.W.2d at 861. It follows that when ordinances contain provisions identical to those in the statute the provisions have the same meaning. This court has previously interpreted disability discrimination provisions in the statute that correspond to the provisions of the Cedar Rapids ordinance. Therefore those interpretations are applicable in determining the meaning of the ordinance. Because the elements of proof of a discrimination claim are derived from the substantive provisions of the ordinance, they are also dictated by comparable statutory interpretations.

III. *Meaning of "disability."* The Cedar Rapids ordinance copies section 601A.6(1)(a) by making it a discriminatory practice for an employer to discriminate in employment against an individual because of a disability of the individual. Using language almost identical to that in section 601A.6(1)(a), the ordinance provides: "If a disabled person is qualified to perform a particular occupation by reason of training or experience, the nature of the occupation shall not be the basis for exception to the unfair or discriminatory practices prohibited by this subsection." Also in a manner almost identical to section 601A.2(11), the ordinance defines disability as follows:

"Disability" means the physical or mental condition of a person which constitutes or constituted a substantial handicap. In reference to employment, under this chapter, "disability" also means the physical or mental condition of a person which constitutes or constituted a substantial handicap, but is unrelated to such person's ability to engage in a particular occupation.

In interpreting a rule of the Iowa Civil Rights Commission in *Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 166–67 (Iowa 1982), this court recognized that a disability is protected under this definition when it does not prevent the individual from performing the job in a reasonably competent and satisfactory manner.

As explained in *Foods, Inc.,* a disability may have some effect on an individual's job performance and nevertheless be protected. The employer is required to make reasonable accommodation for the condition. *See Foods, Inc.,* 318 N.W.2d at 167. The same principle has been recognized in the context of alleged religious discrimination. *See King v. Iowa Civil Rights Commission,* 334 N.W.2d 598, 602 (Iowa 1983).

The meaning of "disability" under the ordinance is a question of law. *See Cassady v. Wheeler,* 224 N.W.2d 649, 651 (Iowa 1974). Pursuant to the definition of disability as interpreted in *Foods, Inc.,* the

legal question thus is whether alcoholism can constitute a physical or mental condition of a person "which constitutes or constituted a substantial handicap" but does not prevent the individual from performing the job in a reasonably competent and satisfactory manner. The question whether alcoholism can constitute a protected disability is independent of the question whether Wright proved he was an alcoholic or had a protected disability on that basis.

■ In deciding whether alcoholism can be a disability under the ordinance, we will adopt the meaning of the term "chronic alcoholism" that appears in Black's Law Dictionary 219 (rev. 5th ed. 1979):

> A medically diagnosable disease characterized by chronic, habitual or periodic consumption of alcoholic beverages resulting in the (1) substantial interference with an individual's social or economic functions in the community, or (2) the loss of powers of self-control with respect to the use of such beverages.

The dictionary definition is consistent with the Iowa General Assembly's definition of "substance abuser" in Code chapter 125. A "substance abuser" is "a person who habitually lacks self-control as to the use of chemical substances or uses chemical substances to the extent that his or her health is substantially impaired or endangered or that his or her social or economic function is substantially disrupted." § 125.2(5). Chemical substances include alcoholic beverages. § 125.2(3). This definition is consistent with a definition supplied by Richard Spurck, an alcohol and drug abuse counselor and probation officer who testified in the present case. He said that the accepted definition from the National Council on Alcoholism is that "an alcoholic is anybody whose drinking is causing persistent lifestyle problems in any department of their life, whether it be in their marriage, in their job, or in their legal situation."

■ So defined, it is clear that alcoholism can be a disability under the Cedar Rapids ordinance. A commentator on the Iowa civil rights statute suggests that "[a]ddiction to drugs or alcohol, various

kinds of mental illness, and periods of recovery from major surgery illustrate the types of intermediate-term impairments which, depending on the totality of the circumstances, may or may not be protected." *See* Nichols, *Iowa's Law Prohibiting Disability Discrimination in Employment: An Overview,* 32 Drake L.Rev. 273, 329 (1982–83). In implementing chapter 601A by rule, the Iowa Civil Rights Commission established criteria for identifying a substantial handicap included in the statutory definition of disability. *See* 240 Iowa Admin.Code § 6.1 (1979). As interpreted by this court in *Sommers · v. Iowa Civil Rights Commission,* 337 N.W.2d 470, 476–77 (Iowa 1983), a physical or mental impairment is a substantial handicap under the rule if it has an inherent propensity to limit one or more of the individual's major life activities independent of the perceptions of others.

■ The rule interpreted in *Sommers* is based on language in the Rehabilitation Act of 1973 and implementing regulations. *See* 29 U.S.C. §§ 701–96 (1976 and Supp. 1983); 29 C.F.R. § 32 (1984). It is instructive that the Rehabilitation Act protects handicapped individuals from employment discrimination much as the Iowa civil rights statute and Cedar Rapids ordinance. Under the federal act, a handicapped individual is a person "who ... has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment...." 29 U.S.C. § 706(7)(A) (Supp.1983). Alcoholism is recognized as such a substantial handicap. *See Davis v. Bucher,* 451 F.Supp. 791, 796 (E.D.Pa.1978). It is a protected disability in employment situations, however, only when it does not prevent proper job performance. In those situations, "[handicapped individual] does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others."

29 U.S.C. § 706(7)(B); *see Davis*, 451 F.Supp. at 797 n. 4. We believe alcoholism can constitute a substantial handicap under the Cedar Rapids ordinance as well.

Unlike the situation with transsexualism in *Sommers*, chronic alcoholism as defined in this opinion and in the record in this case is a physical or mental impairment that actually interferes with the individual's social or economic functioning in the community or interferes with the individual's self-control. By definition, alcoholism has an inherent propensity to interfere with major life activities. It exists separately from the perceptions of others.

Recognizing alcoholism as a disability under the ordinance and as a protected disability when the condition is arrested gives effect to the strong legislative policy in Code chapter 125 ·favoring treatment and rehabilitation of substance abusers. § 125.1(1). The General Assembly has established a department of substance abuse and has included provisions for statewide treatment programs and for licensing of treatment facilities. The director of the department is expressly charged with a duty to "[e]ncourage all health and disability insurance programs to include substance abuse as a covered illness." § 125.10(16).

■■■ Whatever label is applied to the condition to be treated, the condition described in the definitions of chronic alcoholism and substance abuse plainly comes within the definition of "disability" in the Cedar Rapids ordinance. We therefore hold that alcoholism can constitute a protected disability under the ordinance. It is a substantial handicap, but if the alcoholic remains sober the disability should not prevent the individual from performing his or her job in a reasonably competent and satisfactory manner.

IV. *Sufficiency of evidence of disability.* One of the grounds relied on by the district court in reversing the commission in this case was the court's determination that the commission's finding that alcoholism is a disability was not supported by substantial evidence. The court reasoned that the record did not contain any evidence concerning the meaning of alcoholism and that no evidentiary basis thus existed for determining that alcoholism is a protected disability as a question of adjudicative fact. The meaning of the ordinance is, of course, a question of law. In addition, the court's holding overlooks substantial evidence in the commission record in which alcoholism is defined and extensively explained. This evidence, which is consistent with the definition of alcoholism we adopt and the definition of substance abuse provided by the General Assembly, is significant because it confirms that alcoholism embraces symptomology within the ordinance definition of disability.

■■■ In any event, to the extent it is necessary to define alcoholism for the purpose of determining whether it comes within the definition of disability, the issue is one of legislative fact rather than adjudicative fact. *See State v. Henze*, 356 N.W.2d 538, 540 n. 1 (Iowa 1984). Using legislative facts, such as employing dictionary definitions in interpreting statutes, is the province of the courts and does not depend on the introduction of evidence. *See State v. Aldrich*, 231 N.W.2d 890, 894 (Iowa 1975); Iowa R.Evid. 201(a); Fed.R.Evid. 201 advisory committee note. Thus the district court erred in reversing the commission on the ground of insufficient evidence defining alcoholism.

V. *Sufficiency of evidence of Wright's alcoholism.* The second of the two grounds relied on by the district court in reversing the commission was the alleged insufficiency of evidence that Wright is an alcoholic. The court held that the record lacked substantial evidence that Wright is an alcoholic because expert medical evidence of his alcoholism was not presented. We view the record as a whole in deciding whether substantial evidence supported the commission finding that Wright is an alcoholic. *See Woodbury County v. Iowa Civil Rights Commission*, 335 N.W.2d 161, 164–65 (Iowa 1983).

The idea that only a medical doctor can diagnose alcoholism is contrary to our gen-

eral rules concerning opinion evidence. This court has recognized that the source of expert knowledge does not control an expert's qualifications. Knowledge from experience is as valid as academic knowledge. Thus, for example, it is not necessary to have a college degree in biochemistry to testify as to the cause of corn spoilage. *See Kunzman v. Cherokee Silo Co., Inc.*, 253 Iowa 885, 892–93, 114 N.W.2d 534, 538 (1962). This concept is now incorporated in Iowa Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

This rule was in effect at the time the district court made its decision. Moreover, it is merely a restatement of prior Iowa law.

The General Assembly has established a special provision for liberal reception of evidence in agency contested cases: "A finding shall be based upon the kind of evidence on which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs, and may be based upon such evidence even if it would be inadmissible in a jury trial." § 17A.14(1). The Cedar Rapids ordinance contains a similar provision.

 Glenna Williams, who was program director of the Lakeside facility, testified that Wright is an alcoholic. The Lakeside facility was directed by Iowa Methodist Medical Center in Des Moines as part of its chemical dependency program. Williams had been director since September 1980. She had an associate arts degree in human services and two certifications in substance abuse counseling, one from a training program conducted by Iowa Methodist and the other from the Des Moines area community college. At the time of trial she was working for Iowa Methodist in designing a program for a new treatment center to be established at Monticello.

Her training and experience were more than ample to show she had specialized knowledge sufficient to recognize alcoholism. She not only testified that Wright is an alcoholic, she testified to the behavioral manifestations of alcoholism and demonstrated how Wright's behavior matched those symptoms.

Her testimony was far from conclusory. Williams said that the behavior during drinking episodes ascribed to Wright before he was admitted to treatment was the kind of conduct for which treatment was appropriate. Her testimony also included the following:

Q. What would those significant things be? A. That's the deterioration of his relationship with his family, the acting out violent behavior that he had been involved in, and the drinking related arrests he had had prior.

. . . . .

Q. After he entered then and after you had observed him, did he exhibit any behavior that would lead you to the conclusion that he was an alcoholic? A. The behavior that Willard had early and continuing into his treatment experience is synonymous with what many alcoholic people do, and that is operated with a lot of defense mechanisms, be very denying of their illness and the consequences that have gone on as a result of their illness, and to be sincerely deluded, which is truly believing that there isn't anything wrong and that in fact all of these other things are not happening.

Q. Can you possibly remember any specific instances of delusions that Willard Wright had at the time of admission? A. Initially in treatment Willard had great difficulty being honest, and I use that word in terms of a level of awareness, honesty about why, in fact, he had chosen to come to treatment. And that is done when the patient writes a [statement] about what forced me into treatment, only it isn't an external force. It's written as in I forced myself, and he had a great deal of difficulty coming to

real honesty about why he had come into treatment.

She gave a number of specific examples of Wright's symptoms like those described in a discharge summary, which she wrote, that was also part of the evidence.

Williams' testimony was supported by Richard Spurck's testimony. Spurck was also amply qualified as an expert on alcoholism. He testified extensively to the symptoms of alcoholism and said that Wright's behavior matched those symptoms.

Wright's own testimony detailed his behavior. He said:

> I believe probably I had a problem with alcohol since the first time I ever took a drink, which was in excess of twenty years ago. Sporadically [alcohol] would create problems in my living standards and in my home life. Towards the last year of my employment the problem ... started to mushroom. Basically dealt with ... my living style. It had clouded issues, it allowed me to escape reality from family problems. It enabled me to, when I had a problem, rather than deal with the problem alcohol became an escape. Basically that's it.

He developed a pattern of drinking with customers at lunch, drinking heavily after work and going home intoxicated at least twice a week. While drunk he argued with his stepson and wife and abused them. Subsequent to these incidents he could not remember what he had done. It was after the second assault on his wife that he accepted advice to obtain treatment. He testified:

> At that point drinking was the only answer. I had reached the point that, that I knew one way or the other something had to cause my drinking to cease. It was a situation if I took one drink I ended up drunk.

We conclude that the district court erred in ruling that the commission lacked competent and substantial evidence to find Wright is an alcoholic.

V. *Sufficiency of evidence of discrimination.* The district court did not reach the issue of the sufficiency of evidence that Wright was discharged for a discriminatory reason rather than for a proper reason. The employer, however, relies on this ground in seeking to uphold the district court decision. The employer alleges Wright was discharged for poor job performance and for failing to get his drinking problem under control during his stay at Lakeside. Because the employer has preserved error on this contention, we must determine whether the district court decision can be upheld on this ground.

■■ The essence of a discrimination complaint is a claim that an individual has been treated unequally because of a protected characteristic. The complainant bears the burden of persuasion to establish the complaint by a preponderance of evidence throughout the proceeding. When employment discrimination based on disparate treatment is alleged, the complainant must offer sufficient evidence for a trier of fact to find that the alleged prohibited conduct was a factor in the challenged action. *Iowa State Fairgrounds Security v. Iowa Civil Rights Commission,* 322 N.W.2d 293, 296 (Iowa 1982). If a prima facie case is established, the employer has the option of offering a non-discriminatory reason for its conduct. If the employer offers a non-discriminatory reason, the complainant has the burden to persuade the trier of fact that the proffered reason is unworthy of belief. *Id.*

Thus it was necessary for Wright to prove that he suffered from a disability that did not prevent him from performing his job in a reasonably competent and satisfactory manner and that the disability was a factor in the employer's decision to discharge him. We apply the analysis explained in *Woodbury County,* 335 N.W.2d at 165–68, in determining whether the commission finding of discrimination meets the substantial evidence test.

Wright offered evidence, which the hearing officer and commission found to be true, that he had been successful in his position. He received pay raises in each

year of his employment. He was rated as an above average employee and was recommended for promotion and transfer. His raises were based on job performance, improvement and merit.

When Wright was arrested in July 1981 for driving a motor vehicle under the influence of alcohol, his supervisor Wyss summarily fired him. Later in the day, however, Wyss telephoned Wright to inform him that he had been overruled and Wright was not fired. Division manager Monforte later met with Wright and confirmed that the incident would not affect his job.

The August 1981 assault on his wife prompted Wright to seek the advice that led him to seek treatment at Lakeside. It is undisputed that Wyss granted him permission on behalf of the employer to enter the program. Considerable dispute does exist, however, concerning Wright's progress in the treatment program and communications between Lakeside personnel and Wyss.

During the third week of Wright's stay at Lakeside, counselor Donna Sharp and another counselor had a meeting with Wright and Wyss, called a "conjoint." The purpose of the conjoint was to help Wright and Wyss discuss and plan for Wright's return to work. Sharp testified that she explained to Wyss that Wright would be ready and able to return to work upon completion of the thirty-day residency program even if his ceremonial graduation from treatment was deferred because of the necessity of aftercare. Wright testified that Wyss said three times that completion of residency treatment and continuing with any necessary aftercare were the only conditions placed on his return to work. Wright also testified as follows:

> There was also comments made to the fact that he didn't understand how I could have the nerve to return to work and face anybody who worked there. Also informed me there was customers that never wanted to see me again. I made the statement that a problem was a problem, and also it was brought out that guidelines were going to be set so high

and also that on a daily basis I was going to be scrutinized as to my performance. I made the comment that I felt that I could live up to the expectations and wanted a chance to prove myself....

Wyss testified both consistently and inconsistently with the testimony of Sharp and Wright concerning the conditions placed on Wright's return to employment, and the hearing officer and commission believed Sharp and Wright. Wyss confirmed most of the remainder of their testimony about the conjoint. The hearing officer and commission also believed Sharp's testimony that, in Lakeside's view, Wright was ready, willing and able to return to work at the end of thirty days and that she so informed Wyss. There was evidence from which the trier of fact could find that Wyss not only was so informed but that he may have neglected to give that information to the division manager before the decision to discharge Wright was made.

In contending that Wright was discharged for poor job performance, the employer relied on several incidents of alleged failure by Wright to meet his employment responsibilities that allegedly came to light only after Wright entered treatment. The hearing officer did not believe these incidents served as the reason for termination, however, because they were either consistent with company practice, explained satisfactorily, discovered only after Wright was terminated, or insubstantial. The hearing officer necessarily made credibility findings in determining the truth of the employer's contentions, and the commission adopted his findings.

The employer also relied heavily on a written discharge summary issued by Lakeside when Wright left the facility after his thirty-day residency. That summary was as follows:

DISCHARGE SUMMARY—Willard Wright

Admitted: 8–21–81

Discharged: 9–21–81

 Physician: Dr. Wm. Bennett

Discharged Status: ·Six month Graduation Contract

532

Referred By: Dick Spurck, A.S.A.P.

Referred To: AA; Hillcrest Family Services Continuing Care; Dick Spurck

Reason for Admission: Treatment of Alcoholism

*Phase I:* Willard was referred to treatment and sought treatment as a result of assault charges filed by his wife Roxanne. Initially in treatment he minimized the degree of interfering done in other peoples lives, was deluded about the consequences of his drinking behavior and life situation. He had the "drunk parent" assignment to enable him to gain insights into how his son and step-son felt having him for a drunk parent. Willard was closed, seemed to change his affect at will and was hostile. He was given the "hostile" assignment in an attempt to give him information on how he was coming across to other people. That assignment was reassigned as he had not completed it. Upon satisfactory completion of all Phase I assignments Willard was moved to Phase II. Willard's wife Roxanne was his concerned person throughout treatment.

*Phase II:* Willard isolated himself from the rest of the community, spending time in his room, avoided the staff and related with other patients on a one-to-one basis. This was constantly brought to his attention. He remained closed in group relating on a superficial level. He was unable to honestly identify feelings and deal with them appropriately. It seemed he adroitly avoided reality, did not hear feedback and had an unrealistic outlook on his marriage, job and illness.

Willard wrote his life story and completed the 4th Step Inventory of the AA Program.

*Summary and Recommendations:* When it began to be apparent Willard was making little or no changes in behavior, interpersonal relationships or gaining insights a staff decision was made to discharge Willard from treatment on a six month graduation contract. Upon satisfactorily fulfilling specific obligations Willard will be eligible to make a claim to graduate from this program.

/s/ Glenna Williams

Glenna Williams, Program Director Lakeside/Powell III

GW/ss 9–24–81

The hearing officer and commission considered this document in the context of the conjoint during which the treatment program was discussed with Wyss and the conversation between Donna Sharp and Wyss at the conclusion of treatment in which Sharp informed Wyss that Wright was ready, willing and able to return to work.

The record contains substantial evidence that alcoholism treatment is confrontational in nature. The condition is never cured. Rather the object is to enable the alcoholic to stay sober. Maintaining sobriety is accomplished one day at a time. A residential treatment program is only one stage in the process. While successful completion of the program is a phase toward achieving continued sobriety, it is never a guarantee of success.

The residential treatment consisted of two phases. The first phase is designed to force the alcoholic to take responsibility for his or her irresponsible behavior. It addresses the alcoholic's pattern of denial and delusion and promotes awareness of the role of alcohol in the alcoholic's life. Williams said that in Wright's case the first phase of his treatment required him to write and then read to the residential community what forced him into treatment and how his conduct had interfered with other people's lives. He was also required to complete the first three steps of the Alcoholics Anonymous program. The first step was admitting he is powerless over alcohol and his life had become unmanageable; the second step was in coming to believe that a power greater than himself could restore him to "sanity"; and the third step involved a decision to turn his will and life over to God. As the discharge summary shows, Wright had difficulty with the first phase of his treatment, but he successfully completed it.

The second phase of treatment involves more concentrated study of alcoholism and the role it has played in the alcoholic's life. Wright was required to write his life story, concentrating on the progression of his drinking and its effects. He was also required to participate in intense and concentrated group therapy. The third requirement was that he complete the fourth and fifth steps of the AA program. The fourth step required him to make "a searching and fearless moral inventory" of himself. The fifth step required him to admit to God, to himself and to another human being the exact nature of his wrongs.

Before discharge, a continuing care plan is devised by an interdisciplinary team. Four categories of discharge are possible, according to the testimony. One is a dissatisfactory discharge; a second is discharge with graduation; a third is discharge with a three-month graduation contract; and the fourth is graduation with a six-month contract. As the discharge summary shows, Wright was discharged with a six-month graduation contract. This was because he had successfully completed all of the two phases of treatment except for the fifth step of the AA program, and he was given six months within which to complete that step.

In contending that it was justified in discharging Wright for alcoholism, the employer alleges it had imposed a condition on Wright that to keep his job he was obliged to graduate from the program within the thirty days of residential treatment. The hearing officer, resolving the controversy in the testimony, found this was not true. Wright had successfully completed the residency treatment despite the negative tone of the discharge summary, and the commission believed Wyss fully understood and acknowledged that fact. The hearing officer obviously also believed that Wright had made sufficient progress in arresting his alcoholism upon completion of the residential program that, as a matter of fact, he was ready, despite his disability, to perform his job in a reasonably competent and satisfactory manner, within the meaning of the standard adopted in *Foods, Inc.*

In rejecting the employer's position, the hearing officer reasoned as follows:

The second question is whether the employer was justified in terminating Wright on the basis of his alcoholism. The key distinction is whether the alcoholism is under control. Put simply, I do not believe an employer is obligated by the Municipal Ordinance or the Iowa Civil Rights Act to retain employees who are intoxicated during work hours or by their intoxication during non-work hours are unable to perform their job duties satisfactorily. In Wright's case the evidence indicates that it was the company's judgment that his alcoholism did not interfere with the performance of his job duties. Specifically, when he was arrested for OMVUI and discharged for that reason by his immediate supervisor, the company went to extraordinary lengths of having a regional manager travel to Cedar Rapids, meet with Wright and reinstate him to his position because the company's perspective was that he was adequately performing his job duties. A short time later Wright, at his own initiative, elected to undergo treatment for alcoholism. Then his immediate supervisor, who had suffered the embarrassment of being reversed, played a critical role in the conclusion by Consolidated that Wright should be discharged. But for the fact that Wright acknowledged his own alcoholism and voluntarily submitted to treatment, he would never have been subjected to the discharge, as long as his alcoholism had not interfered with his employment.

Furthermore, the conduct of his immediate supervisor, Wyss, evidences an extreme prejudice against individuals who have trouble using alcohol. He put into effect a rule regarding the discharge of employees who were arrested for OMVUI and applied that rule to his terminal only. The rule did not exist in that form anywhere else within Consolidated Freightways. He felt that Wright should have been fired at the time of the OMVUI incident and was reversed in a

humiliating way in the eyes of all of the rest of the employees at the terminal by the regional manager. When Wright completed treatment, it was this supervisor's personal determination that Wright was not willing, ready and able to return to work, in direct contradiction of the advice given by the medical experts who were involved in the treatment program. It is further unclear whether the medical expert's advice was even communicated to the Chicago office when Wyss was consulting with them regarding the pending discharge of Wright. To the degree that the rules of the Iowa Civil Rights Act are applicable by analogy to the Municipal Ordinance in Cedar Rapids, when Wyss overturned the advice of the treatment facility personnel he was not properly applying the concept of a bona fide occupational qualification. While I am persuaded that abstention from the use of alcohol would constitute a BFOQ for employees suffering the disease of alcoholism, in this instance Wyss seems to have deliberately ignored the opinion of those who treated Wright that Wright had, in effect, rehabilitated himself sufficiently to meet the employer's qualifications.

It is interesting to note that the administrative rules of the Iowa Civil Rights Act, 240—6.3(601A), specifically state as follows:

> Disabilities arising during employment. When an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist in his or her rehabilitation. No terms in this section shall be construed to mean that the employer must erect a training and skills center.

I do not believe that that rule should be interpreted to require an employer to retain an alcoholic employee who is intoxicated during work hours. However, Wyss fired Wright despite being informed by the treatment facility that Wright was ready, willing and able to return to work. That recommendation by Lakeside over a period of time proved correct by Wright's subsequent total abstention from the use of alcoholic beverages. In discharging Wright Consolidated was not making "every reasonable effort to continue the individual in the same position or to retain or reassign the employee and to assist in his or her rehabilitation."

This reasoning, adopted by the commission, is supported by substantial evidence.

■ The question here "is not whether there is sufficient evidence to warrant a decision the agency did not make, but rather whether there is substantial evidence to warrant the decision it did make." *Peoples Memorial Hospital v. Iowa Civil Rights Commission*, 322 N.W.2d 87, 91 (Iowa 1982). Nor do the courts upon review put themselves in the place of the agency. The question therefore is not whether the employer "could have had" the non-discriminatory reasons it claims it had for terminating Wright's employment. Rather the question is whether a reasonable person in the position of the commission could conclude upon the whole record that disability discrimination was actually a factor in the decision to terminate him. We give an affirmative answer to this question.

In reaching this conclusion we recognize that the ordinance, like the Iowa civil rights statute, imposes a burden on an employer that does not exist with at least some other forms of discrimination. The prohibitions against disability discrimination involve a policy choice by legislative bodies that the public interest requires the employment of handicapped individuals when their handicaps do not prevent them from performing their jobs in a reasonably competent and satisfactory manner. Reasonable accommodation is required. No claim was made by the employer in this case that Wright's disability could not be reasonably accommodated. *See* Nichols, *supra*, 32 Drake L.Rev. at 400–01. The factfinder found that Wright had a substantial handicap but that, because he had achieved sobriety with reasonable prospects of maintaining that

status, his handicap did not prevent him from properly performing his job. Because that finding is sufficiently supported in the evidence, we are bound by it.

The effect of the commission findings in the present case is to deem pretextual or untrue the non-discriminatory reasons advanced by the employer for discharging Wright. *See Linn Co-op Oil Co. v. Quigley*, 305 N.W.2d 729, 732–33 (Iowa 1981). We have no basis under the applicable standard for disturbing those findings.

VI. *Damages.* The City and Wright contend the employer was given an opportunity by the commission to participate in the computation of damages but concede no hearing was held on the damages issue. The hearing officer had stated a hearing would be held on the question if liability were found. In these circumstances the City and Wright do not resist remand of the case to the commission for a hearing and determination of damages. We so order.

REVERSED AND REMANDED.

All Justices concur except REYNOLDSON, C.J., McGIVERIN, LARSON and CARTER, JJ., who dissent.

CARTER, Justice (dissenting).

I dissent. In order to sustain an award to the claimant based on an alleged employment discrimination, both the local civil rights commission and a majority of this court engage in a self-contradictory fact-finding process in which different interpretations are placed on the same evidence depending on which element of the claim is being considered.

In considering whether Wright has established that one or more of his major life activities are sufficiently limited to satisfy the definition of disability which it has fashioned, the majority views the evidence as showing a man with a drinking problem which had reached "critical proportions." In support of this conclusion, it points out that Wright regularly engaged in drinking with customers during working hours when he himself testified that "if I took one drink I ended up drunk." In the month prior to that in which he began treatment, Wright was arrested for operating a motor vehicle while under the influence of alcohol while returning from company business in a company car. He was convicted of that offense. At or about the same time, his relationships with his family had deteriorated to an impossible situation resulting in physical violence.

Although the majority accepts the implicit significance of the foregoing evidence in its finding that Wright's major life activities were impaired when he began treatment on August 21, 1981, it completely ignores the implicit significance of the same evidence in considering the validity of the commission's finding that within a period of only thirty days Wright's condition had improved to an extent that he could perform the duties of his job satisfactorily with no direct threat to the property or safety of others.

I submit that there is no substantial evidence in the record to support the latter finding which is an essential element of Wright's right to recover for employment discrimination. Under any fair and balanced consideration of the record, Wright's drinking problems after treatment were substantially the same as they had been before treatment had begun. There had been no apparent progress in solving the several interpersonal problems he was experiencing, each of which was of a character which detracted from his ability to satisfactorily perform his job assignment.

In order to sustain its finding that Wright's substance abuse problem would not hinder his job performance, the commission relies upon the conclusory testimony of a staff member at the treatment facility who was not familiar with the requirements of Wright's employment with Consolidated. The same staff member signed a discharge summary for Wright's treatment program which completely negates any meaningful progress on his part while in the treatment program.

Perhaps in recognition of the undisputed evidence that Wright's treatment program

had been a failure, the commission also seeks to sustain its finding that he could perform in his employment setting by a misplaced reliance on its belief that he had performed satisfactorily at his job prior to receiving treatment. The latter conclusion appears to rest on the fact that Wright, prior to receiving treatment, went to work each day, went through the motions of doing what he was supposed to do, and in the process of his sales activities generated a certain amount of business for his employer. I submit, however, that it is not one of the policies of our employment discrimination laws to compel the continued employment of an uncontrolled substance abuser simply because that person is able to function to some extent within a work environment.

In the present case, Wright's substance abuse problem was still uncontrolled based upon any fair characterization of the evidence. The obvious risks to an employer from continuing such a person in a job capacity which requires use of a company car in entertaining prospective customers of the employer cannot be ignored. The commission attempted to ignore this problem by conveniently compartmentalizing the potential effects of the handicap between personal and business activities and by concluding that in the past Wright's transgressions fell more heavily in the personal area than in the employment area. I submit that the line simply cannot be drawn in this manner.

Wright's potential for aberrant behavior had been exhibited within his employment setting by an OMVUI arrest and conviction. This was about a month before he undertook treatment. Consolidated's decision not to terminate his employment immediately following that occurrence was made at a time before Wright himself had confided to his employer that his drinking problem was out of control. Once that knowledge was imparted to Consolidated, it would, I submit, have been justified in reversing its prior decision to continue Wright's employment. It did not act precipitously on the matter, however, and agreed that if some success were achieved by Wright through the treatment program at Lakeside his employment would be continued. Only when Consolidated received a copy of Wright's discharge summary showing no progress had been made did it act to terminate his employment.

Given the foregoing circumstances, I submit that Consolidated's decision was reasonable based on the information which was available to it. No evidence presented before the commission suggests that the decision was not reasonable. The district court was correct in reversing the decision of the commission, and I would affirm its judgment.

REYNOLDSON, C.J., and McGIVERIN and LARSON, JJ., join this dissent.