# IN THE SUPREME COURT OF IOWA

No. 13–0010

Filed June 27, 2014

**JOHN GOODPASTER,**

Appellant,

vs.

**SCHWAN'S HOME SERVICE, INC.**
and **TODD SWANSON,** Individually and in His Corporate Capacity,

Appellees.

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Plaintiff appeals from the district court's grant of summary judgment in favor of defendant. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

Jill M. Zwagerman and Alyssa I. Snyder of Newkirk Zwagerman Law Firm P.L.C., Des Moines, for appellant.

Alan L. Rupe of Kutak Rock LLP, Wichita, Kansas, and Kathryn E. Jones of Kutak Rock LLP, Omaha, Nebraska, for appellees.

Mark D. Sherinian and Melissa C. Hasso of Sherinian & Hasso Law Firm, West Des Moines, and Thomas J. Duff of Duff Law Firm, P.L.C., Des Moines, for amicus curiae Iowa Association for Justice.

**CADY, Chief Justice.**

In this appeal involving a lawsuit for wrongful termination of employment, we must determine whether multiple sclerosis is a disability contemplated by the Iowa Civil Rights Act of 1965 (ICRA), Iowa Code chapter 216 (2011). If so, we must also determine whether the employee was otherwise qualified to perform the essential functions of his employment as a product delivery driver who must hold a commercial driver's license. The district court granted summary judgment for the employer. On our review, we conclude multiple sclerosis is a disability under the ICRA and that a genuine issue of material fact exists regarding whether the employee was qualified to perform the essential functions of the position. Accordingly, we reverse the district court and remand for further proceedings.

## I. Background Facts and Prior Proceedings.

John Goodpaster was employed by Schwan's Home Service, Inc. as a customer service manager. Schwan's is the largest home delivery frozen foods company in the nation and operates sales companies from various locations around the country, including Des Moines. The Des Moines location was managed by Todd Swanson. Goodpaster began working for Schwan's as a manager trainee and was promoted to customer service manager in August 2007. His main duty was to sell and deliver company products to customers at their homes or place of business. A basic requirement of the job was to operate a commercial vehicle and meet all requirements of the U.S. Department of Transportation (DOT), including maintaining a driver's license and medical certification to drive.

Goodpaster sought medical attention in late 2008 after suffering chest pains and loss of eyesight. He was seen by several doctors and

underwent multiple medical examinations and tests, including an examination at the Mayo Clinic. A neurologist at the Mayo Clinic suspected Goodpaster had "quiescent subclinical" multiple sclerosis. A neurologist in Des Moines diagnosed Goodpaster with multiple sclerosis, although another doctor was unable to identify any symptoms of multiple sclerosis in Goodpaster. Goodpaster had other medical ailments, including fibromyalgia and hypertension.

Goodpaster continued to work despite his medical problems. Over the next one and one-half years, he would occasionally experience what he called "flare-ups" while working. During these flare-ups, which occurred between five and ten times, he would experience vision impairment and loss of control and strength in his arms and legs. Medical providers advised him to stop working and to relax until the symptoms subsided. Goodpaster had no form of medical restrictions on his work.

At times, Goodpaster asked Schwan's to rearrange his route due to his health condition. He was accommodated on each occasion. However, on another occasion, Goodpaster asked Swanson if someone could transport him from a location on his delivery route to the company office because he felt it was unsafe for him to drive. In response, he was asked to "gut it out." On another occasion, Goodpaster requested that Swanson make arrangements for another employee to ride with him on his route as a backup driver in the event he suffered a flare-up. This request was also denied. Goodpaster also sought a transfer to a warehouse position. He was never interviewed for an opening in the warehouse because he did not meet the requirement of having prior warehouse experience.

Goodpaster's sales began to decrease. Over time, he became the lowest performing customer service manager at the Des Moines location. Swanson, however, had removed Goodpaster from some of his most profitable routes and assigned him to less profitable routes. Sales expectations and quotas were part of the job, and Goodpaster was failing to meet the company's expectations.

Goodpaster was given several written warnings about his failure to meet company sales expectations. After no improvement was made, Goodpaster was terminated.

Goodpaster subsequently filed a lawsuit in district court under the ICRA for disability discrimination and retaliation. He claimed he was terminated from his employment because he had multiple sclerosis. He also claimed Schwan's failed to provide him with reasonable accommodations. Goodpaster sued both Schwan's and Swanson.

Schwan's and Swanson moved for summary judgment. They claim Goodpaster could not establish a case for discrimination or retaliation as a matter of law. Among other specific grounds, Schwan's claimed Goodpaster did not have a qualifying disability, was not qualified to perform the essential functions of the job with or without a reasonable accommodation, and had no direct or indirect evidence of discrimination. Schwan's and Swanson also argued there was no causal connection between Goodpaster's request for accommodations and termination of his employment to support the retaliation claim. Finally, Schwan's and Swanson claimed Schwan's had a legitimate, common nondiscriminatory reason to terminate Goodpaster.

Goodpaster moved to compel discovery prior to submission of the summary judgment motion so he could fully resist the proceeding. The district court denied the request.

The district court granted summary judgment on all claims. Goodpaster appealed. On appeal, he claims multiple sclerosis is a disability protected under the ICRA, and his claim was sufficient to withstand summary adjudication.

## II. Scope of Review.

We review a decision by the district court to grant summary judgment for correction of errors at law. *See Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001); *see also* Iowa R. App. P. 6.907. Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *Swartzendruber v. Schimmel*, 613 N.W.2d 646, 649 (Iowa 2000). "The burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law." *Sallee v. Stewart*, 827 N.W.2d 128, 133 (Iowa 2013). As we determine whether the moving party has met this burden, we view the record in the light most favorable to the nonmoving party. *See Wright v. Am. Cyanamid Co.*, 599 N.W.2d 668, 670 (Iowa 1999). "Even if facts are undisputed, summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions." *Walker Shoe Store, Inc. v. Howard's Hobby Shop*, 327 N.W.2d 725, 728 (Iowa 1982).

## III. Discussion.

The ICRA makes it "an unfair or discriminatory practice" to discharge an employee or otherwise discriminate against an employee "because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(*a*). To prevail on a disability discrimination claim under the ICRA, Goodpaster must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of the customer service manager position, and (3) the circumstances of his

termination raise an inference of illegal discrimination. *See Schlitzer v. Univ. of Iowa Hosp. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002). We begin by considering the first element of the claim.

**A. Whether Goodpaster's Multiple Sclerosis Constitutes a Disability Under the ICRA.** The Act defines a "disability" as "the physical or mental condition of a person which constitutes a substantial disability." *Id.* § 216.2(5). The definition also includes the condition of a person with a positive diagnosis of human immunodeficiency virus, acquired immune deficiency syndrome, and related diagnoses, but no further legislative explanation is provided. *See id.*

Regulations promulgated by the Iowa Civil Rights Commission, however, do elaborate on the meaning of a disability. *See* Iowa Admin. Code r. 161—8.26 (providing definitions for various terms related to disability discrimination in employment). They provide that "[t]he term 'substantially handicapped person' shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." *Id.* r. 161—8.26(1).[1] Goodpaster seizes on this definition to argue that he is a disabled person under all three prongs of the definition. Because we conclude a genuine issue of

---

[1]Neither our Code nor regulations explicitly refer to a "substantially handicapped person" in any other place. Instead, it appears the legislature and the Iowa Civil Rights Commission have updated the phrasing in other areas. *See, e.g.*, Iowa Code § 216.2(5) (" '*Disability*' means the physical or mental condition of a person which constitutes a *substantial disability*, and the condition of a person with a positive human immunodeficiency virus test result, a diagnosis of acquired immune deficiency syndrome, a diagnosis of acquired immune deficiency syndrome-related complex, or any other condition related to acquired immune deficiency syndrome." (Second emphasis added.)). Nonetheless, we believe this regulation is intended to provide the relevant definition of those persons covered by the ICRA and accordingly take notice of this provision.

material fact exists regarding the issue of actual disability, we can confine our analysis to the first prong of the definition involving the presence of an actual disability that impairs a major life activity.

> The term "physical or mental impairment" means:
>
> *a.* Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or
>
> *b.* Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

*Id.* r. 161—8.26(2). Additionally, "[t]he term 'major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* r. 161—8.26(3).

We have never determined whether multiple sclerosis is a disability under the ICRA, although we have assumed without comment in a past case that multiple sclerosis is a disability. *See Boelman v. Manson State Bank*, 522 N.W.2d 73, 77–78 (Iowa 1994). In this case, we confront the question head-on.

To begin with, multiple sclerosis fits within the broad category of a "physiological disorder or condition" that generally affects the neurological system. *See id.* r. 161—8.26(2)(*a*). Further, there was sufficient record evidence that Goodpaster's multiple sclerosis limits some major life activities, like walking, during episodic flare-ups. *See id.* r. 161—8.26(3). The fighting question is whether the occasional flare-ups experienced by Goodpaster constitute a substantial limitation of a major life activity.

The phrase "substantially limits" is not defined by statute or the Iowa Administrative Code. The underlying controversy—whether Goodpaster's multiple sclerosis is a disability under the ICRA—essentially centers on these words. Both parties rely to some extent on federal law.

Schwan's argues multiple sclerosis is not a disability, and primarily relies on a federal court case that held multiple sclerosis does not substantially limit any major life activity. *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 733–35 (8th Cir. 2010). The holding in *Nyrop* is grounded in a pair of United States Supreme Court cases that increased the threshold inquiry in order to decide if an impairment substantially limits a major life activity under the Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. §§ 12101–12213.[2] First, in *Sutton v. United Air Lines, Inc.*, the Supreme Court held that whether an impairment substantially limits a major life activity "is to be determined with reference to corrective measures" such as medication or eyeglasses. 527 U.S. 471, 488, 119 S. Ct. 2139, 2149, 144 L. Ed. 2d 450, 466 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553, *as recognized in Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 342 n.5 (E.D.N.Y. 2008), *aff'd in part, vacated in part on other grounds*, 381 Fed. Appx. 85, 90 (2d Cir. 2010). Second, in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, the Court held the phrase "substantially limits a major life activity" must be interpreted strictly, reasoning that the language "substantially" and "major" precludes minor impairments. 534 U.S. 184, 196–98, 122 S. Ct.

---

[2]The court in *Nyrop* acknowledged a series of 2008 amendments substantially modifying the ADA, which we discuss further below, but found the amendments were not retroactive and did not apply them to decide the case. 616 F.3d at 734 n.4.

681, 691, 151 L. Ed. 2d 615, 630–31 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553, *as recognized in Ragusa*, 582 F. Supp. 2d at 341 n.4.  The *Toyota* Court also held:

> [T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.  The impairment's impact must also be permanent or long term.

*Id.* at 198, 122 S. Ct. at 691, 151 L. Ed. 2d at 631.  It opined that the terms "major life activities" and "substantial limitation" "need to be interpreted strictly to create a demanding standard for qualifying as disabled."  *Id.* at 196, 197, 122 S. Ct. at 691, 151 L. Ed. 2d at 631.

Congress amended the ADA in 2008.  *See* ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008).  The Federal Act now provides, "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).  Notably, it specifies that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  *Id.* § 12102(4)(D).  Additionally, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication."  *Id.* § 12102(4)(E)(i)(I).

A review of the legislative history reveals Congress disfavored the *Toyota* and *Sutton* cases.  Senator Tom Harkin of Iowa, the bill's lead sponsor, chief advocate, and floor manager in the Senate, declared the bill was "rejecting several opinions of the Supreme Court that have had the effect of restricting the meaning and application of the definition of

disability." *See* 154 Cong. Rec. S8342–01 (daily ed. Sept. 11, 2008) (statement of Sen. Tom Harkin). Similarly, Representative George Miller of California stated the bill "revers[ed] flawed court decisions to restore the original congressional intent of the [ADA]." 154 Cong. Rec. H8286–03 (daily ed. Sept. 17, 2008) (statement of Rep. George Miller). Of course, the original intent of the ADA is best captured by the passionate words of Senator Harkin, whose brother Frank is deaf, when he delivered the Senate's first sign language floor speech upon the ADA's passage, "that today Congress opens the doors to all Americans with disabilities; that today we say no to fear, that we say no to ignorance, and that we say no to prejudice." 136 Cong. Rec. S9684–03 (daily ed. July 13, 1990) (statement of Sen. Tom Harkin).

Importantly, federal regulations and agency rules promulgated to implement the 2008 amendments declare multiple sclerosis to be a disability. *See* 29 C.F.R. § 1630.2(j)(3)(iii) (2013) ("[A]pplying the principles set forth in . . . this section, it should be easily concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . multiple sclerosis substantially limits neurological function . . . ."); *see also* Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as amended, 76 Fed. Reg. 16,978–01, 16,987, 16,989, 17,004 (Mar. 25, 2011) (to be codified at 29 C.F.R. pt. 1630). Similarly, the introduction to a final agency rule explains:

> The Amendments Act states that its purpose is "to reinstate a broad scope of protection" by expanding the definition of the term "disability." Congress found that persons with many types of impairments—including epilepsy, diabetes, HIV infection, cancer, multiple sclerosis, intellectual disabilities (formerly called mental retardation), major depression, and bipolar disorder—had been unable to bring ADA claims because they were found not to meet the

> ADA's definition of "disability." Yet, Congress thought that individuals with these and other impairments should be covered and revised the ADA accordingly. Congress explicitly rejected certain Supreme Court interpretations of the term "disability" and a portion of the EEOC regulations that it found had inappropriately narrowed the definition of disability.

*Id.* at 16,987. Thus, it is now clear that federal law considers multiple sclerosis to be a disability.

Goodpaster contends the ADA Amendments Act of 2008 requires us to interpret of the ICRA to include multiple sclerosis. We disagree, at least with his initial phrasing of the point. Federal law does not necessarily control our interpretation of a state statute. Iowa employers must follow federal law, but it is axiomatic that an amendment to a federal statute does not simultaneously and automatically amend a parallel or even identical Iowa statute. Just as "we are not bound by federal cases construing a federal statute when we are called upon to construe our own Civil Rights Act," *Loras Coll. v. Iowa Civil Rights Comm'n*, 285 N.W.2d 143, 147 (Iowa 1979), we are not bound by the language of federal statutes when interpreting language of the ICRA, *cf. DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 7 (Iowa 2009) ("[W]e must be mindful not to substitute 'the language of the federal statutes for the clear words of the [ICRA].'" (quoting *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989))).

Notwithstanding, we recognize the Iowa Act "only pronounces a general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003). Initially, we note that the ICRA declares that it "*shall be construed broadly to effectuate its purposes.*" Iowa Code § 216.18(1) (emphasis added). Of course, *Toyota*

and *Sutton* did not construe the terms of the federal statute broadly. *See Toyota*, 534 U.S. at 196–98, 122 S. Ct. at 691, 151 L. Ed. 2d at 630–31; *Sutton*, 527 U.S. at 488, 119 S. Ct. at 2149, 144 L. Ed. 2d at 466; *see also* Alex B. Long, *"If the Train Should Jump the Track . . .": Divergent Interpretations of State and Federal Employment Discrimination Statutes*, 40 Ga. L. Rev. 469, 495 (2006) ("The Supreme Court's restrictive reading of the ADA's terms has provoked a large outcry from academics and the original sponsors of the measure in Congress."); Sandra F. Sperino*, Diminishing Deference: Learning Lessons from Recent Congressional Rejection of the Supreme Court's Interpretation of Discrimination Statutes*, 33 Rutgers L. Rec. 40, 42 (2009) ("[T]he Supreme Court has often chosen narrow statutory interpretations that do not comport with the liberal reading to be given to employment discrimination statutes."). As noted by Representative Tony Coehlo, the lead sponsor of the ADA in the House of Representatives who suffer from epilepsy, "The Supreme Court wrote me out of my own bill." Tony Coelho, *Our Right to Work, Our Demand to Be Heard: People with Disabilities, the 2004 Election, and Beyond*, 48 N.Y.L. Sch. L. Rev. 729, 734 (2003). Indeed, the construction of the ADA was so narrow that Congress intervened.

In the past, section 216.18(1) has had a substantive impact on the outcome of a case. *See, e.g., Polk Cnty. Secondary Rds. v. Iowa Civil Rights Comm'n*, 468 N.W.2d 811, 815–16 (Iowa 1991) (distinguishing a narrow rule in *Brown v. Pub. Emp't Relations Bd.*, 345 N.W.2d 88 (Iowa 1984), because "*Brown* was not a civil rights case" and construing the ICRA "broadly to effectuate its purposes"). Indeed, this section has led us before to adopt broad definitions to eliminate employment discrimination. *See Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 382–83 (Iowa 1986)

(adopting a broad definition of "actual damages" in part because of precursor to section 216.18). Other state courts have relied upon similar broad language to depart from narrow federal civil rights precedent. *See Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 573 (Minn. 2008) (indicating broader view of civil rights statute required because state law explicitly "requires liberal construction of its terms"); *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 785 (Ohio 1999) (same); *Marquis v. City of Spokane*, 922 P.2d 43, 49–50 (Wash. 1996) (rejecting federal caselaw holding independent contractors are not protected under employment discrimination law and relying in part on explicit requirement to construe state statute liberally).

Further, unlike federal law, where civil rights protections against employment discrimination are scattered into three statutes—the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623(a), and the ADA, 42 U.S.C. § 12112—Iowa has one unified statute, Iowa Code chapter 216. While numerous fractures in the federal law have developed depending upon the statute involved, no such fractures arise under Iowa law. *See* Sandra F. Sperino, *Revitalizing State Employment Discrimination Law,* 20 Geo. Mason L. Rev. 545, 546–64 (2013).

These initial observations reveal *Toyota* and *Sutton*, which were explicitly built upon a core premise that the ADA must be "interpreted strictly to create a demanding standard for qualifying as disabled," *Toyota*, 534 U.S. at 197, 122 S. Ct. at 691, 151 L. Ed. 2d at 631; *accord Sutton*, 527 U.S. at 488, 119 S. Ct. at 2149, 144 L. Ed. 2d at 466, are inapposite to any discussion of the meaning of the ICRA. Thus, we find

these federal cases do not aid in the interpretation of our Iowa statute today.

We acknowledge we relied on *Toyota* and *Sutton* in a 2004 case to resolve a claim under the ADA. *See Hansen v. Seabee Corp.*, 688 N.W.2d 234, 239–40 (Iowa 2004). A close reading of *Hansen*, however, reveals it was solely an ADA case. *See id.* at 235–37. In *Hansen*, a worker noticed he had a sore back and was subsequently diagnosed with a sacroiliac lesion. *Id.* at 236. Eventually, he was laid off and filed a disability discrimination lawsuit under the ICRA and then subsequently amended his petition to include a claim under the ADA. *Id.* Following a bench trial, the district court directed a verdict for the defendant on plaintiff's state-law claim, reasoning plaintiff was not disabled under the ICRA. *Id.* at 237. However, the court found plaintiff was disabled under the ADA and entered judgment for the plaintiff. *Id.* In summarizing the posture of the case on appeal, we explained that Seabee appealed, alleging "Hansen failed to establish he was disabled under the ADA. Hansen did not cross-appeal or otherwise rely upon his state claims to support the district court judgment. Consequently, our review is limited to the federal ADA claim." *Id.* Relying on *Toyota* and *Sutton*, we determined the plaintiff was not disabled under the ADA and reversed the district court. *Id.* at 239–44. Accordingly, *Hansen* similarly has no bearing on our determination of whether multiple sclerosis is a disability under the ICRA.

On the other hand, we are guided by the broad reach early interpretations gave the Act. An early—and influential—law review article regarding Iowa's law against disability discrimination in employment opined that, broadly speaking, three categories of disabilities exist under Iowa law:

> The category [into which a purported disability fits] will depend on the nature of the particular disability and the specific allegations of discrimination. The first category consists of disabilities which, on their face, are acknowledged to be substantial handicaps. Blindness, deafness, epilepsy, paralysis—these and other permanent impairments are clearly protected. The second category consists of handicaps which the Commission regards as insubstantial *per se*. Migraine headaches, common colds, the flu, a simple fracture and other temporary conditions of a relatively trivial nature exemplify this category. The third category is the most difficult to describe. It consists of impairments which are neither permanent nor evanescent, but which fall somewhere in the middle. Addiction to drugs or alcohol, various kinds of mental illnesses, and periods of recovery from major surgery illustrate the types of intermediate-term impairments which, depending on the totality of the circumstances, may or may not be protected.

Scott H. Nichols, *Iowa's Law Prohibiting Disability Discrimination in Employment: An Overview*, 32 Drake L. Rev. 273, 328–29 (1983) [hereinafter Nichols]. Multiple sclerosis is not part of the second category consisting of insubstantial impairments. Rather, multiple sclerosis is very likely among the group in which certain impairments, "on their face, are acknowledged to be substantial handicaps." *Id.* at 239.

Schwan's points out that we have held a condition must be " 'permanent or long term' " to qualify as disabling. *See Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 61 (Iowa 1999) (internal quotation marks omitted)). In *Vincent*, we noted that one factor in determining whether a condition substantially limits a major life activity is "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (internal quotation marks omitted). The other factors are "[t]he nature and severity of the impairment" and "[t]he duration or expected duration of the impairment." *Id.* (internal quotation marks omitted).

Iowa law has for years contemplated some disabilities might be permanent but, unlike federal law, has never contemplated that a

disability could not be intermittent or episodic. *See Foods, Inc. v. Iowa Civil Rights Comm'n*, 318 N.W.2d 162, 164–69 (Iowa 1982) (concluding plaintiff who suffered from intermittent grand mal seizures due to epilepsy could maintain ICRA claim in spite of an administrative regulation that required the disability be "unrelated" to the plaintiffs' ability to perform available jobs). Clearly, the plaintiff's condition in *Foods*—epilepsy—did not substantially impair her ability to complete major life activities for large portions of time. Rather, she was only impaired—and then quite substantially—during grand mal seizures.

Similarly, we held alcoholism was capable of being a disability under the ICRA in *Consolidated Freightways, Inc. v. Cedar Rapids Civil Rights Commission,* 366 N.W.2d 522, 526–28 (Iowa 1985).[3] Additionally, we specifically contemplated that it was a protected disability "when the condition is arrested." *Id.* at 528. We noted that alcoholism "is a substantial handicap, but if the alcoholic remains sober the disability should not prevent the individual from performing his or her job in a reasonably competent and satisfactory manner." *Id.*

We also observe that the regulations promulgated by the commission to define disability were based heavily on the definition of disability contained in the Federal Rehabilitation Act of 1973, as amended, 29 U.S.C. § 705(20). Nichols, 32 Drake L. Rev. at 334. A number of federal cases applying the Rehabilitation Act of 1973 consider

---

[3]We note that, in *Consolidated Freightways*, we considered whether the employee was disabled under a Cedar Rapids city ordinance. *See* 366 N.W.2d at 524. Iowa Code section 216.19 requires cities to secure the rights protected by the ICRA and permits cities to provide greater protections against unfair or discriminatory practices. *See* Iowa Code § 216.19. The city ordinance at issue in *Consolidated Freightways*, however, contained a definition that was "almost identical" to the definition of "disability" in the ICRA. *See* 366 N.W.2d at 526. Therefore, we find *Consolidated Freightways* persuasive.

multiple sclerosis as a disability, often without any significant inquiry into the issue. *See Fulton v. Goord*, 591 F.3d 37, 40, 43 (2d Cir. 2009) (holding plaintiff with multiple sclerosis had standing to pursue claim under Rehabilitation Act of 1973); *Langon v. Dep't of Health & Human Servs.*, 959 F.2d 1053, 1056, 1059–61 (D.C. Cir. 1992) (holding summary judgment against plaintiff with multiple sclerosis was inappropriate); *Carter v. Casa Cent.*, 849 F.2d 1048, 1050, 1053–54 (7th Cir. 1988) (upholding district court ruling that plaintiff with multiple sclerosis was denied job as a result of disability); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1387 (10th Cir. 1981) (holding plaintiff with multiple sclerosis established he is a disabled person who was rejected from a residency program based on his disability); *see also Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995) (referring to multiple sclerosis as a disability and distinguishing it from the plaintiff's proffered basis of discrimination, his inability to drive).

Federal cases prior to *Toyota* considered whether multiple sclerosis is a disability and either considered it to be a disability, *see Mortiz v. Frontier Airlines, Inc.*, 147 F.3d 784, 786 (8th Cir. 1998), or contemplated it could constitute a disability based on testimony of how it impacts an individual's life and work, *see Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("To show she had a 'disability,' [plaintiff] must establish that she had an impairment that substantially limited her major live activities . . . ."); *see also Flight*, 68 F.3d at 64 (rejecting plaintiff's ADA claim because the ADA "is inapplicable because the distinction in the present case is not based upon Flight's *disability, multiple sclerosis,* but rather upon his inability to drive" (emphasis added)). Moreover, multiple sclerosis was considered a disability under other federal statutes (with statutory language similar to the ICRA) prior

to the United States Supreme Court's now-superseded decisions. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996) ("It is clear that Rusinov's MS is a handicap within the meaning of the [Fair Housing Act]."); *see also Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 330, 336 (2d Cir. 1995) (holding plaintiff who suffered from multiple sclerosis had demonstrated a likelihood of success on the merits of Fair Housing Amendments Act claim and was entitled to a preliminary injunction).

Accordingly, we hold multiple sclerosis can constitute a disability under the Iowa Act if the plaintiff produces evidence that the condition substantially impaired one or more major life activities during episodes or flare-ups, even if it did not impair life activities at all when in remission.

Turning to the evidence in this case, Goodpaster has generated a genuine issue of material fact regarding whether his multiple sclerosis substantially limits his major life activities. He testified that during flare-ups, he experiences vision impairment, memory loss, fatigue, and loss of control and strength in his arms and legs.

Schwan's draws on caselaw that casts doubt on whether a substantial limitation can exist when the plaintiff experiences memory loss, *see Crock v. Sears, Roebuck & Co.*, 261 F. Supp. 2d 1101, 1117–18 (S.D. Iowa 2003), vision problems, *see Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 904–05 (8th Cir. 2010), fatigue, *see Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1204 (10th Cir. 2003), or difficulty walking, *see Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 685 (8th Cir. 2003). However, these cases are ADA cases hailing from an era of federal law in which the ADA turned a blind eye to victims of episodic ailments. *Crock*, for instance, pointed out that the plaintiff there stated "some of [her]

symptoms are constant while the severe symptoms are episodic," and concluded "even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity." 261 F. Supp. 2d at 1117. *Crock* then cites *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001), in which the Fourth Circuit held profound symptoms associated with epileptic seizures did not amount to a disability under the ADA. *Crock*, 261 F. Supp. 2d at 1117–18.

*Crock* correctly followed federal law as it existed in 2003. Yet, that state of the law is no longer extant. *Sara Lee* is inconsistent with Iowa law. *Croy* is similarly inapposite to the ICRA. A person may be disabled under the ICRA, even during the intermissions of their symptoms, so long as their symptoms constitute a substantial limitation when active. *See, e.g.*, *Consol. Freightways*, 366 N.W.2d at 528; *Foods*, 318 N.W.2d at 168–69.

We hold Goodpaster generated a genuine issue of material fact regarding whether his multiple sclerosis substantially limits one or more of his major life activities.[4]  He has at least generated a jury question.

---

[4]In addition to the major life activity of walking, for example, a genuine issue of material fact exists regarding whether Goodpaster's multiple sclerosis substantially limits his ability to work. This is unsurprising, as the ability to work is something of a disability discrimination catchall, and "impairments that substantially limit a person's ability to work usually substantially limit one or more other major life activities." *See* 29 C.F.R. § 1630.2(j) app. (2013). To be clear, in the past, we required the proffered disability to be "generally debilitating" and to "affect [the employee] regardless of the job he might hold." *Henkel Corp. v. Iowa Civil Rights Comm'n*, 471 N.W.2d 806, 810 (Iowa 1991). We said, "An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute." *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 436 (Iowa 1988); *accord Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1248 (6th Cir. 1985); *Salt Lake City Corp. v. Confer*, 674 P.2d 632, 636–37 (Utah 1983). Schwan's asserts Goodpaster's multiple sclerosis was not generally debilitating because Goodpaster is qualified for other jobs and currently works as a laborer. However, *Henkel*, which itself involved a disability discrimination claim based on depression and anxiety, suggests multiple sclerosis is in fact generally debilitating. *See Henkel*, 471 N.W.2d at 810.

**B. Whether Goodpaster is Qualified to Perform the Essential Functions of the Job With or Without Accommodation.** Goodpaster must also be able to show he is qualified for the customer service manager position. *See Schlitzer*, 641 N.W.2d at 530. To do so, he must show he, "with or without reasonable accommodation, 'can perform the essential functions of the position . . . without endangering the health and safety of [himself] or others.'" *Boelman*, 522 N.W.2d at 80 (alteration in original) (quoting 29 C.F.R. § 1613.702(f) (1993)). We then consider whether Schwan's failed to offer Goodpaster a reasonable accommodation. We use a two-step inquiry to determine whether an employee is qualified for a position. *Id.* at 80. First, the fact finder must determine if the employee can perform the essential functions of the position without an accommodation. *Id.* If an employee can perform the essential functions of a position without an accommodation, the employee is qualified and can make a prima facie case of disability discrimination, and the inquiry at this stage of the case ends. *See id.* If the employee cannot perform the essential functions of the position, the fact finder must determine whether a reasonable accommodation exists that would permit the employee to do so. *See id.* If so, the employee is qualified; if not, the employee is not qualified for the position and cannot make a prima facie case of disability discrimination. *See id.* We address these inquiries in turn.

1. *Qualified employee.* The first step of our inquiry is whether Goodpaster "could perform the essential functions of the job." *Id.* "The 'essential functions' of the job are those that 'bear more than a marginal relationship to the job at issue.'" *Id.* (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)). We have said in the past that a person is qualified when the person "can perform the essential functions

of the job 'in spite of' his or her disability." *Id.* (quoting *Miller v. Sioux Gateway Fire Dep't,* 497 N.W.2d 838, 841 (Iowa 1993)). "This inquiry must consider '[t]he nature and extent of a disability, the needs of a particular job, and the impact of disability on a person's ability to perform that job.' " *Courtney v. Am. Nat'l Can Co.,* 537 N.W.2d 681, 685 (Iowa 1995) (alteration in original) (quoting *Frank v. Am. Freight Sys., Inc.,* 398 N.W.2d 797, 801 (Iowa 1987)). " '[T]he court must consider whether the person has "the requisite skill, experience, education and other job-related requirements of the employment position that such individual *holds* or *desires*." ' " *Schlitzer,* 641 N.W.2d at 531 (quoting *Treanor v. MCI Telecomms. Corp.,* 200 F.3d 570, 575 (8th Cir. 2000)). "Whether an individual is qualified for a particular job, despite his or her disability, requires an individualized inquiry." *Courtney,* 537 N.W.2d 685.

In this case, the primary qualification at issue is whether Goodpaster could obtain the necessary DOT certification. The United States Supreme Court has held that an employer may defend a discriminatory termination action under the ADA when the employer terminated the employee pursuant to the DOT regulations requiring a certain level of visual acuity for commercial drivers. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567–78, 119 S. Ct. 2162, 2169–74, 144 L. Ed. 2d 518, 531–38 (1999). The reasoning behind this holding is that "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." *Id.* at 573, 119 S. Ct. at 2172, 144 L. Ed. 2d at 535. The Court stated:

> The Senate Labor and Human Resources Committee Report on the ADA stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification

standards in order to be considered a qualified individual with a disability under title I of [the ADA]."

*Id.* at 573, 119 S. Ct. at 2172–73, 144 L. Ed. 2d at 535 (quoting S. Rep. No. 101–116, at 25 (1989)) (first alteration in original).

Schwan's argues Goodpaster was not qualified by essentially asserting the "direct threat" defense under the ADA, which provides that "[a]n employer may impose as a qualification standard 'a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.' " *Id.* at 569, 119 S. Ct. at 2170, 144 L. Ed. 2d at 532 (quoting 42 U.S.C. § 12113(b) (1994 & Supp. III)). A " 'direct threat' [is] defined by the [ADA] as 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.' " *Id.* (quoting 42 U.S.C. §12111(3)). While conceptual daylight would ordinarily exist between the "essential function" aspect of a prima facie case of disability discrimination and the "direct threat" defense under the ADA, the inquiries appear to collapse together in this context. *See Kapche v. City of San Antonio*, 304 F.3d 493, 494, 500 (5th Cir. 2002) (per curiam) (considering whether a police officer could safely perform an essential function of the position—driving and holding an individualized assessment of the officer's claim using the direct-threat defense model is required).

The determination of whether an impairment substantially limits a major life activity and accordingly constitutes a disability under the Act should ordinarily be reviewed on a "case-by-case basis" even though "[s]ome impairments may invariably cause a substantial limitation of a major life activity." *Albertson's, Inc.*, 527 U.S. at 566, 119 S. Ct. at 2169, 144 L. Ed. 2d at 530–31. So too should the determination of whether a plaintiff is qualified to perform the essential functions of a position with

or without accommodation generally be determined by a case-by-case analysis as opposed to resorting to a blanket exclusion of a class of workers from a given job. *See* 29 C.F.R. § 1630.2(*r*) (2013) ("The determination that an individual poses a 'direct threat' shall be based on an *individualized assessment* of the individual's present ability to perform the essential functions of the job." (Emphasis added.)); *Kapche,* 304 F.3d at 494, 500 (vacating grant of summary judgment and holding plaintiff with insulin-treated diabetes mellitus required individualized assessment of his "ability to safely perform the essential functions" of a police officer position, which included driving). There is no reason to take a contrary approach.

This conclusion is bolstered by federal regulations that provide guidance to medical examiners evaluating whether a driver who has a neurological condition may nevertheless obtain a commercial license. The mere diagnosis of a disease that could impact driving is insufficient to disqualify a driver. *See* 49 C.F.R. § 391.43 ("Instructions for Performing and Recording Physical Examinations"). The regulations provide: "Any neurological condition should be evaluated for the nature and severity of the condition, the degree of limitation present, the likelihood of progressive limitation, and the potential for sudden incapacitation." *Id.* Furthermore, authority relevant to the criteria indicated that multiple sclerosis can result in disqualification, but it recognizes not all cases of multiple sclerosis are the same and that some people with multiple sclerosis may be able to obtain certification. U.S. Dep't of Transp., *Conference on Neurological Disorders and Commercial Drivers* 28–29 (1988), www.fmcsa.dot.gov/regulations/medical/ conference-neurological-disorders-and-commercial-drivers-part-i.

In this case, the record supported a conclusion that Goodpaster was recertified to drive a commercial vehicle in 2008 and 2009. At the same time, the evidence revealed he did not tell the doctor who made the certification that he had multiple sclerosis in 2008, and the record was unclear about the result of the certification in 2009. Yet, Goodpaster at least generated a fact issue on the question whether he was qualified to perform the essential functions of the customer service manager position. Accordingly, a genuine issue of material fact exists regarding whether Goodpaster was qualified to perform the essential functions of the customer service manager position without accommodation.

2. *Reasonable accommodation.* Even with evidence in the record to support a conclusion that Goodpaster continued to be licensed to operate a commercial vehicle, Schwan's asserts Goodpaster still could not safely and adequately perform the essential functions of his job with accommodations because no reasonable accommodations existed. In other words, even with a license to drive, Schwan's argues Goodpaster was disqualified because he could not drive at times and his requested accommodations needed to overcome his inability to drive were unreasonable as a matter of law.

"If the plaintiff cannot perform the essential functions of the job, then the fact finder goes on to the second inquiry—'whether any reasonable accommodation by the employer would enable [the plaintiff] to perform those functions.'" *Boelman*, 522 N.W.2d at 80 (alteration in original) (quoting *Chandler*, 2 F.3d at 1394). This second phase of the inquiry stems from the unique nature of disability discrimination:

> Discrimination against the disabled differs from other types of discrimination in that other types, such as racial, religious, or sex discrimination, usually bear no relationship to the individual's ability to perform a job. Consequently, it

is necessary to provide a requirement of reasonable accommodation in order to eliminate discrimination against the disabled.

*Cerro Gordo Cnty. Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 196–97 (Iowa 1987). Therefore,

> [a]n employer shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

Iowa Admin. Code r. 161—8.27(6).

"If an employee's ability to do her job depends on reasonable accommodation, the employee must make a facial showing that reasonable accommodation was possible." *Schlitzer*, 641 N.W.2d at 530. This showing is not an onerous one and requires no more of the employee than to propose an accommodation and present testimony of its feasibility. *See, e.g., Wood v. Omaha Sch. Dist.*, 985 F.2d 437, 439 (8th Cir. 1993) ("[P]laintiffs must initially meet the burden of providing evidence sufficient to make at least a facial showing that reasonable accommodation is possible. [Plaintiffs] have met their burden by proposing that defendants allow them to conduct self-blood-tests and to carry snacks." (Citation omitted.)).

A regulation promulgated by the Iowa Civil Rights Commission specifies that a reasonable accommodation may include:

> (1) Making facilities used by employees readily accessible to and usable by handicapped persons, and
> (2) Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions.

Iowa Admin. Code r. 161–8.27(6)(*a*). Another regulation provides:

> When an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every

> reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist that individual's rehabilitation. No terms in this rule shall be construed to mean that the employer must erect a training and skills center.

*Id.* r. 161—8.28.

If the plaintiff shows a reasonable accommodation is possible, "the burden shifts to the employer to prove that it is not able to accommodate the plaintiff's disability or that the proposed accommodation is unreasonable." *Boelman,* 522 N.W.2d at 80. To do so, the employer must "demonstrate that the accommodation would impose an undue hardship on the operation of its program." Iowa Admin. Code r. 161—8.27(6). Another regulation promulgated by the Iowa Civil Rights Commission provides:

> In determining pursuant to the first paragraph of this subrule whether an accommodation would impose an undue hardship on the operation of an employer's program, factors to be considered include:
>
> (1) The overall size of the employer's program with respect to number of employees, number and type of facilities, and size of budget;
>
> (2) The type of the employer's operation, including the composition and structure of the employer's workforce; and
>
> (3) The nature and cost of the accommodation needed.

*Id.* r. 161–8.27(6)(*b*). In other words, "[i]n considering the reasonableness of an employer's accommodation of an employee's disability, we must consider not only the disabled employee's needs but also the economic realities faced by the employer." *Halsey v. Coca-Cola Bottling Co. of Mid-Am., Inc.,* 410 N.W.2d 250, 253 (Iowa 1987).

We have said "[a]n accommodation is unreasonable if it requires the employer to change the essential nature of the job or if it places undue burdens on the employer." *Boelman,* 522 N.W.2d at 80. For example, removing the duty of operating a forklift from the position of

forklift operator—ninety-eight percent of the working hours of the position—was an unreasonable accommodation. *Courtney*, 537 N.W.2d at 687. We have also said in the past that a "reasonable accommodation must be made by an employer only if it does not substantially impinge on the rights of other employees or incur more than a de minimus cost to the employer." *Frank*, 398 N.W.2d at 803.

The accommodations requested by Goodpaster to overcome his inability to drive and perform his duties included having another employee pick him up when he needed to stop driving, rearranging his route, having a driver accompany him on his route, and reassigning him to a warehouse position. Schwan's claims these accommodations were unreasonable as a matter of law.

The economic realities faced by an employer to provide an accommodation surface in this case. While a jury might reasonably conclude from the economic considerations in this case that a second driver would be an unreasonable accommodation, we recognize the record was generally underdeveloped on the issue of the reasonableness of accommodations. Moreover, the record was sparse because the district court cut the discovery short by granting summary judgment for Schwan's based predominantly on its conclusion that the medical condition suffered by Goodpaster was not a disability as a matter of law. As a result, the district court rejected the request by Goodpaster to seek further discovery on the reasonableness of possible accommodations, and this action should not now be used by Schwan's to support its claim that there is no evidence in the record to support a triable issue on the reasonableness of the accommodations. On balance, the issue of the reasonableness of some of the requested accommodations presented a jury issue.

**C. Whether the Circumstances of This Case Raise an Inference of Unlawful Discrimination.** Schwan's claims the evidence in the case could not, as a matter of law, establish an inference of discrimination because the only reasonable conclusion that can be drawn from the record is Goodpaster was fired for poor job performance and poor sales. It claims there was no evidence presented that the termination was motivated by disability discrimination.

Consistent with our resolution of the previous issues, the record supports the conclusion that Goodpaster presented a jury issue on whether the termination was motivated by his disability. There was some evidence that Schwan's relied on Goodpaster's "health issues" in terminating him. Additionally, the record was not fully developed because the district court denied additional discovery.

**IV. Conclusion.**

Having considered all issues raised, we reverse the summary judgment granted by the district court. We remand the case for further proceedings.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

All justices concur except Waterman and Mansfield, JJ., who dissent.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent. The district court correctly granted Schwan's motion for summary judgment based on the undisputed facts. I would affirm. Goodpaster had the burden to prove (1) he has a disability, (2) he is qualified to perform the essential functions of his delivery job with or without accommodation, and (3) the circumstances of his termination raise an inference of illegal discrimination under the Iowa Civil Rights Act of 1965 (ICRA), Iowa Code ch. 216 (2011). *See Schlitzer v. Univ. of Iowa Hosp. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002). Viewing the evidence in the light most favorable to Goodpaster, Schwan's established the absence of any genuine issue of material fact on each of those elements. The majority fails to explain how Goodpaster could be found disabled when he obtained other employment. Nor does the majority explain why Goodpaster's requested accommodation—a second driver to retrieve or accompany him on his job driving a delivery truck—is not unreasonable as a matter of law. Employers are not obligated under the ICRA to pay two persons to do the job of one as an accommodation.

I disagree with the majority's conclusion that Goodpaster's multiple sclerosis raised a jury question whether he is disabled within the meaning of the ICRA. Although his multiple sclerosis at times interfered with his ability to drive, it is undisputed he was physically capable of other satisfactory work. To the extent his condition *does* impair his driving, he is unable to perform an essential function of the job. Goodpaster tries to have it both ways: he claims he is disabled because his condition impairs his driving, yet he also claims he can perform the essential functions of the job—most importantly, driving.

His requested accommodation—to have "another driver ride along with him when he was ill"—is unreasonable as a matter of law. Finally, Schwan's had a valid, nondiscriminatory reason to terminate him because he failed to meet his sales quotas. I would not postpone the day of reckoning on a case doomed to dismissal.

The majority neglects to mention that after Schwan's terminated Goodpaster, he found full-time employment as a laborer and also operated his own painting business on the side. His ability to perform those physically demanding jobs is undisputed. Yet, the majority declares "Goodpaster generated a genuine issue of material fact exists regarding whether his multiple sclerosis substantially limited one of his major life activities." I disagree because it is undisputed Goodpaster is able to maintain full-time employment consistent with his skills and experience. Multiple sclerosis may render a person substantially disabled in *some* cases, but this is not such a case. To his credit, Goodpaster has learned to manage his condition and earn an income. He is not disabled.

Iowa Code section 216.2(5) defines "disability" as "the physical or mental condition of a person which constitutes a substantial disability." A substantial disability is one that "substantially limits one or more major life activities." Iowa Admin. Code r. 161—8.26(1). We have explained that the phrase " 'substantially limits' must be interpreted to mean the degree to which the impairment affects an individual's employability," despite the broad definition of "major life activities" in Iowa Administrative Code rule 161—8.26(3). *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 436 (Iowa 1988). This interpretation is necessary "[i]n order that the statute's construction be consistent with [its] purpose"; namely, "the protection of employment opportunities." *Id.*;

*accord Halsey v. Coca-Cola Bottling Co. of Mid-Am., Inc.,* 410 N.W.2d 250, 252 (Iowa 1987) (noting the ICRA protects those with "substantial physical impairment[s] affecting [their] ability to perform on the job").

Accordingly, "[t]he degree to which an impairment substantially limits an individual's employment potential must be determined with reference to a number of factors:" (1) "the number and type of jobs from which the impaired individual is disqualified," (2) "the geographical area to which the individual has reasonable access," and (3) "the individual's job training, experience and expectations." *Probasco*, 420 N.W.2d at 436. Applying these factors, we have long held that "[a]n impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute." *Id.*; *accord Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 920 (Iowa 1997) (considering the ICRA claim and noting " '[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working' " (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1997))). Only when a condition is "generally debilitating" and affects an individual "regardless of the job he [or she] might hold" will we find that person disabled under Iowa Code section 216.2(5). *Henkel Corp. v. Iowa Civil Rights Comm'n*, 471 N.W.2d 806, 810 (Iowa 1991).

In several cases, we have applied the rule that a person is not substantially disabled if the person is able to obtain satisfactory employment. In *Probasco*, the plaintiff claimed her condition, chronic susceptibility to bronchitis, precluded her from certain positions— "receptionist at a beauty shop, secretary in a grain elevator, clerical work in hospital laboratories." 420 N.W.2d at 437. We concluded the "record shows that, *as a matter of law,* Probasco's employability is not curtailed

to the extent which would qualify her as a 'disabled person' within the protection of the [ICRA]." *Id.* (emphasis added) (reversing district court's affirmance of Iowa Civil Rights Commission's disability finding). We explained, "the fact Probasco's condition renders it inadvisable that she work around a particular set of environmental conditions is insufficient to qualify her as a disabled person under our statute." *Id.* (citing *Forrisi v. Bower*, 794 F.2d 931 (4th Cir. 1986), as an example of when "an individual's inability to work around particular employment conditions—there, those conditions involving heights—did not so limit the individual's employability so as to bring the individual within the protection of similar legislation").

In *Hollinrake v. Iowa Law Enforcement Academy*, we noted the plaintiff was not substantially disabled because, "while [the plaintiff] is limited in this particular job because of his vision, he is not limited in any significant way from obtaining other satisfactory employment." 452 N.W.2d 598, 604–05 (Iowa 1990) (affirming district court's dismissal of plaintiff's petition for judicial review). Likewise, in *Vincent v. Four M Paper Corp.,* tried to the bench, we affirmed the district court's conclusion that the plaintiff "was not substantially limited in the major life activity of working because his 'physical condition was not so debilitating that he would have been prevented from obtaining other satisfactory employment.'" 589 N.W.2d 55, 59, 61–62 (Iowa 1999). We stated, "[t]he number and type of jobs from which [the plaintiff] was disqualified because of his impairment was fairly limited" and explained that the plaintiff's condition "preclud[ed him] from working at his former position of machine tender, [but] this rather narrow limitation did not significantly curtail [his] ability to obtain other employment not involving

heavy equipment or dangerous machinery." *Id.* at 62. We concluded the plaintiff

> failed to present substantial evidence that his impairment precluded him from performing a class of jobs or a broad range of jobs in various classes as required to establish the existence of a substantial limitation on his ability to work.

*Id.*

This case is even more clear-cut than *Probasco*, *Hollinrake*, or *Vincent*. It is undisputed that Goodpaster's condition only occasionally impairs his driving and that he has been able to obtain satisfactory employment elsewhere. He obtained employment full-time as a laborer boring underground power lines, frequently working overtime, and reopened his own painting company. Goodpaster testified at his deposition that he has never been told by any healthcare professional that he has any physical limitation. He admitted, "The only comments that have been made to me by some doctors is when I have [flare-ups], take a little time, go, you know, and relax a second, . . . but they never told me I couldn't do my job." In 2009, a doctor noted that Goodpaster "has had no exacerbations with regards to his multiple sclerosis in the last year" and concluded Goodpaster "has no significant impairment that would restrict his ability to operate a DOT vehicle."

The facts of this case are much like those of *Brunker v. Schwan's Home Service*, 583 F.3d 1004, 1008 (7th Cir. 2009). In that case, another Schwan's delivery man with multiple sclerosis alleged Schwan's terminated him in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12213 (2000). *Brunker*, 583 F.3d at 1005–06. The federal district court granted summary judgment in favor of Schwan's, concluding the plaintiff "was not substantially limited

in a major life activity." *Id.* at 1007. The Court of Appeals for the Seventh Circuit agreed:

> Even when viewed in the light most favorable to Brunker, his impairments are not sufficient to show that he is disabled. In May 2003 his physician allowed him to return to work without any restriction at all. Once he returned, he drove the same route by himself and completed it just as quickly as he had in the past. In addition, during Brunker's stay at the Mayo Clinic, the doctor noted that his dizziness episodes, previously a daily occurrence, were occurring less frequently. Brunker also told the doctor that his writing difficulty was "variable" and his speech slurred "at times when he is tired." Accordingly, we agree with the district court's conclusion that the evidence in this record shows only "intermittent" difficulties rather than a substantial limitation on a major life activity.

*Id.* at 1008.[5] Similarly, Goodpaster's physicians did not place any restrictions on him. He was able to complete his route upon returning to work, so long as he followed his doctor's advice to take breaks as needed. And, most importantly, he obtained other employment after his termination.

Undisputed facts establish that Goodpaster's ability to obtain satisfactory employment is not substantially limited. Goodpaster's employment prospects are not geographically limited. *Cf. Bearshield*, 570 N.W.2d at 921–22 (reversing summary judgment for employer because "[a] reasonable person could also find Bearshield is for all practical purposes unable to relocate to find work"). Nor is he disqualified from a wide range of other available jobs or from many jobs for which he has training and experience. *See Hollinrake*, 452 N.W.2d at 604. Goodpaster is not "generally debilitat[ed]." *See Henkel*, 471 N.W.2d

---

[5]The *Brunker* court remanded the case, however, because it concluded a genuine issue existed as to whether Schwan's regarded Brunker as disabled. 583 F.3d at 1009.

at 810. Accordingly, he does not meet the definition of "disabled" as a matter of law.

Nor did Schwan's regard Goodpaster as disabled. To prevail on a "regarded as" claim, Goodpaster needed to prove that Schwan's viewed him as unable to work in a broad class of jobs. *See Knutson v. Ag Processing, Inc.*, 394 F.3d 1047, 1052 (8th Cir. 2005). I agree with the district court's conclusion: "the evidence does not create a genuine fact issue that Schwan's perceived Goodpaster as disabled based on some stereotype or myth but, rather, merely reacted to Goodpaster's complaints and requests when he was ill." It is also undisputed Schwan's employed Goodpaster for a year after learning he had multiple sclerosis, demonstrating it regarded Goodpaster as able to perform his job satisfactorily despite his diagnosis. The district court properly rejected Goodpaster's "regarded as" claim.

If Goodpaster is disabled because his multiple sclerosis sometimes impairs his driving, then he cannot show he is qualified to perform the essential functions of his delivery driver position. His position at Schwan's required him to drive to his customers' homes. It is undisputed that driving is an essential function of that position. *See Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 915 (8th Cir. 2013) ("No genuine issue of material fact exists that being DOT qualified to drive a delivery truck is an essential function of Knutson's position [with Schwan's].") As the district court summarized:

> There is no dispute that driving a commercial motor vehicle was one of the essential functions of Goodpaster's job. Goodpaster's claimed disability is vision impairment and loss of strength in, and or control of, his limbs. . . . For obvious reasons, the disability of unpredictable onset of vision impairment and limb control prevents Goodpaster from being qualified to perform one of the essential functions of his job: operating a motor vehicle. Such a condition . . .

renders him incapable as a matter of law and fact from having "[t]he ability to effectively operate a commercial vehicle," one of the specific requirements of his position.

"[A]n employer is not required to change the essential nature of the job in order to accommodate an employee . . . ." *Henkel*, 471 N.W.2d at 811. If Goodpaster cannot reliably drive—the basis of his disability claim—then he is not qualified for a customer service manager position at Schwan's.

Goodpaster's suggested accommodation—that Schwan's should have hired another driver to ride along with him in the event he suffered a flare-up of his multiple sclerosis—is unreasonable and would not have enabled him to perform the essential functions of his job. The district court correctly ruled that, as a matter of law, Goodpaster's requested accommodations would not render him "qualified":

> None of the accommodations he requested would have enabled him to operate a motor vehicle. Rather, the proposed accommodations (sending someone to drive him back to the shop when he had a problem or sending a second driver along with him) would simply have eliminated an essential function of his job.

(Footnote omitted.) Goodpaster was essentially requesting that Schwan's pay two employees to do the work of one. Such an accommodation is unreasonable as a matter of law. *See Knutson*, 711 F.3d at 915–16 (affirming summary judgment in favor of Schwan's, holding Schwan's was not required to waive DOT license certification in order to accommodate home delivery driver who became vision impaired). Moreover, it would not solve Goodpaster's problem—he would still be unable to drive his routes to customers' homes.

Finally, I disagree that a genuine issue of material fact exists as to whether Schwan's discharged Goodpaster because of his condition. Rather, it is undisputed that Schwan's never penalized Goodpaster because of his multiple sclerosis. Again, the district court got it right:

[T]he evidence actually shows that Goodpaster never suffered any adverse job action *because* of blurred vision or loss of use of his limbs and his concomitant inability to drive. On the first occasion he had the problem, his supervisor told him to "gut it out" which, apparently, he did. On the less than ten other times it happened, he followed his physician's instructions for dealing with such episodes, recovered and carried on with the work. There is no evidence that Schwan's ever disciplined him or took any other action against him because he took these "time outs," so to speak, to recover from episodes of blurred vision or loss of limb function. This means either that the blurred vision and loss of limb function was not a disability or, if it was, that Schwan's accommodated it.

Schwan's continued to work with Goodpaster for over a year before terminating him, apparently in hopes that his sales abilities would improve. *Cf. Howell v. Merritt Co.*, 585 N.W.2d 278, 281 (Iowa 1998) (noting that close proximity in time between employer's discovery of employee's condition and the employee's discharge presented factual issue precluding summary judgment). No evidence raises an inference of discrimination because of his multiple sclerosis.

Uncontroverted evidence in the record established that Schwan's terminated Goodpaster because he did not make his sales quotas. *See id.* at 280 (noting the ICRA prohibits only " 'the discharge of any employee because of the employee's disability' " and does not bar employers from discharging employees due to " 'the nature of the occupation' " (quoting *Henkel*, 471 N.W.2d at 809)). Goodpaster's manager communicated the sales expectations to him; it was no surprise to Goodpaster that he was underperforming. When asked at his deposition if he knew he was not making his sales quota, Goodpaster responded, "yes." Goodpaster knew he was costing Schwan's money. He recounted:

[C]ustomers are used to having a driver at a certain time, and because I ha[d] to keep rearranging my [schedule] . . . it got to the point where [my manager] was, like, don't you

understand we're losing money, our customers are used to having you there at a certain time.

He also recognized that his name was at the bottom of the sale rankings "day in and day out." There is no evidence generating a jury question whether Schwan's discharged Goodpaster because of his multiple sclerosis. *See Beatty v. Hudco Indus. Prods., Inc.*, 881 F. Supp. 2d 1344, 1355 (N.D. Ala. 2012) (considering employee's claim based on multiple sclerosis and commenting "mere knowledge of [a] disability does not equate with discrimination"). Goodpaster was terminated because of "his inability to perform the necessary tasks of his job," which were "essential based on the economic realities faced by the employer." *Henkel*, 471 N.W.2d at 811. His multiple sclerosis did not give him lifetime tenure or immunity from termination for poor sales.

> Iowa's disability legislation

> "assures that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps. It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment."

*Probasco*, 420 N.W.2d at 436 (quoting *Forrisi v. Bower*, 794 F.2d 931, 934 (4th Cir. 1986)). By allowing Goodpaster to proceed with his claim, the majority does a disservice to those who truly are substantially limited in their ability to work.

Mansfield, J., joins this dissent.